IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| The State Bank of Freeport,<br><br>   Plaintiff,<br><br> v.<br><br>Whiteside County,<br>John Booker, in his official capacity as Whiteside County Sheriff, and<br>Tim Erickson, in his official capacity as Lieutenant of Corrections of the Whiteside County Jail<br>   Defendants. | Case No.: 22-cv-50278<br><br>Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

After Michael Kinison died by suicide while incarcerated at Whiteside County Jail, his Estate claimed that the Jail, its Administrator, and the County Sheriff were deliberately indifferent to Kinison's mental health needs.[1] For the reasons explained below, the Court grants the Defendants' Motion for Summary Judgment on all counts.

---

[1] The Parties argued and agreed that the deliberate indifference standard is applicable to this case. Dkt. 56, at 2; Dkt. 64, at 6, 8, 10. The Court's not so sure. *See Pittman v. Madison Cnty.*, 108 F. 4th 561, 565-71 (7th Cir. 2024) (recognizing that the Eighth Amendment standard applies to individuals incarcerated because of a conviction and that the Fourteenth Amendment standard applies to pretrial detainees). The Court recognizes that this is a complicated area of law. *Pittman*, 108 F. 4h at 571 ("This is a very complicated area of law, and in no way are we alone in struggling to determine the appropriate mental state standard for judging pretrial detainees' claims."). So, the Court takes the Parties at their word that the deliberate indifference standard applies. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (arguments not made are waived).

1

I.    Background

Based on the Parties' filings, the following facts are undisputed.[2]

a.  Factual allegations

When Michael Kinison was booked into the Whiteside County Jail in July 2020, the arresting officers warned Jail employees that Kinison had attempted suicide the day before. *See* Dkt. 53-6, 25:24–26:2; Dkt. 62 ¶ 3. Kinison stayed on suicide watch for six days at the Jail. When he first met with the Jail's licensed clinical social worker, Traci Geiger-Banks, three days after his arrest, he reported some suicidal ideations, but stated, "I'm not going to hurt myself." Dkt. 62 at ¶ 8. Out of caution, Geiger-Banks left Kinison on suicide watch, pending further evaluation. *Id.* at ¶ 9.

In his second meeting with Geiger-Banks, three days later, Kinison expressed sorrow for acting out and denied any ongoing suicidal ideation. *Id.* at ¶ 11. "I don't want to hurt myself," Kinison added at his follow-up appointment. "I won't hurt myself or kill myself." *Id.* "I am not here to die." *Id.* Based on Kinison's overall

---

[2] "On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: They help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Factual allegations "should not contain legal argument," and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2). "District courts are entitled to expect strict compliance with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606–07 (N.D. Ill. 2011) (internal citations omitted).

presentation and those four denials, Geiger-Banks removed Kinison from suicide watch after six days. *Id.* at ¶ 12.

It's entirely possible, however, that Kinison feigned his recovery to end the isolation that necessarily accompanies suicide watch at the Whiteside County Jail. *See id.* at ¶ 11 (Kinison stated, "I need to get out of that room."). The week after he was removed from suicide watch, Kinison placed two private phone calls to family, saying goodbye and warning, "this will be the last you hear from me." Dkt. 71 at ¶ 23. There is no evidence in the record that family members reported these calls to Jail employees. There's also no evidence that any employee heard these calls before Kinison's death.[3]

Instead, the employees who'd monitored Kinison both during and after his suicide watch believed he was recovering. Dkt. 62 at ¶¶ 14, 17. Correctional officers never saw any logs or reports indicating that Kinison might harm himself. *Id.*; *id.* at ¶ 17. To the contrary, Kinison told Jail employees he was feeling better. *Id.* at ¶ 14; *see id.* at ¶ 11. He took daily medications for depression and anxiety and spoke regularly with a counsellor. *Id.* at ¶¶ 10, 14. He talked frequently about his children and his goals for the future. *Id.* at ¶ 5.

In the days before his death, others described Kinison as being in "good spirits" and "a good mood," "happy," and "upbeat."[4] *Id.* at ¶ 13; Dkt. 53-8 at 61: 9–13; Dkt.

---

[3] Although jail calls are recorded, employees do not surveil those calls in real time.

[4] One inmate remarked that Kinison did not appear upset or depressed in the days before his suicide. Dkt. 62 at ¶ 23. A second inmate, who spoke with Kinison on the morning of

3

53-6 at 21:15–20. No employees mentioned any reservations or disagreement with Geiger-Banks' decision to end Kinison's suicide watch. *See, e.g.*, 53-2 at 36:4–13. Furthermore, the record doesn't identify any other inmates ever attempting suicide after Geiger-Banks removed them from suicide watch. *See* Dkt. 62 at ¶ 16.

Less than three weeks after his second evaluation with Geiger-Banks, Kinison hanged himself by his bedsheets. *Id.* at ¶ 34. Before taking his own life, Kinison covered his cell observation window with a blanket, in violation of Jail rules. *Id.* When officers entered Kinison's cell to investigate the covered window, about half an hour later, they were already too late. *Id.* at ¶ 35.

b. **The Parties' positions**

On these facts, Kinison's Estate argues that the Jail and its employees were deliberately indifferent to Kinison's serious medical needs. The Estate believes that Jail employees could have prevented Kinison's suicide if they'd enforced, or at least more clearly communicated, the rule against obstructing windows. In response to the Estate's "failure to educate" theory, the Defendants cite undisputed testimony that all inmates receive a handbook during the booking process, warning that officers will confiscate any sheet, blanket, or towel that is repeatedly used to cover a cell window. *Id.* at ¶¶ 38, 50; Dkt. 53-1 at 32:11–14. The same warning appears on a kiosk available to all inmates. Dkt. 53-1 at 34:20–35:1.

---

his death, noted that nothing Kinison said or did that morning piqued a suspicion that Kinison might harm himself. *Id.* at ¶ 24.

Having said that, both Parties agree that the rule against covering windows isn't strictly enforced at the Whiteside County Jail. Dkt. 62 at ¶ 59. For instance, officers typically give verbal warnings instead of confiscating property. *Id.* at ¶ 55–56. And most officers oblige an inmate seeking a few minutes of privacy to use the restroom; they simply finish the lap around the cell block before returning to check on the inmate. *Id.* at ¶¶ 52–57. The Parties debate the exact frequency of these occurrences, but they agree that inmates covered their cell windows at least once daily. *Id.* at ¶ 55.

Given this inconsistency in enforcing Jail rules, Defendant Whiteside County moves for summary judgment, contending that there's no evidence of a widespread pattern or practice of deliberate indifference. Sherrif Booker and Lieutenant Erickson also move for summary judgment, arguing that the Estate's official-capacity claims are redundant of its claim against the County.

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).

A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved

5

conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). However, "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III. Analysis

Deliberate indifference is a rigorous standard, demanding "something approaching total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012); *see Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019). It only "occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). Where the harm at issue is a suicide, the plaintiff must show that the defendant "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006).

But to the extent that Jail employees recognized Kinison's mental health needs in this case, they reasonably accommodated them by placing him on suicide watch, providing regular mental health counselling, and administering medication. This course of treatment at least *appeared* to improve his condition. Kinison's

6

attending nurse, correctional officers, and fellow inmates believed his mental health was improving.

There's no indication that Jail employees knew any more treatment was needed; no employee heard Kinison make suicidal statements after his release from suicide watch, the record doesn't suggest that any employee heard Kinison place those final phone calls to his family, and there's no evidence that the family members who received these calls ever alerted Jail staff.

Instead, Kinison denied intending to harm himself four times and, by the time he was released from suicide watch, denied having any suicidal ideations. These facts alone defeat all three deliberate indifference claims. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (affirming summary judgment against an inmate who showed no obvious signs he was an imminent suicide risk); *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (affirming summary judgment because the inmate, like Kinison, denied having suicidal thoughts).

Rather than citing any evidence on the record showing the Defendants' subjective state of mind, *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022), the Estate deals with objective realities. It may very well be true that Kinison's mental health either held steady or worsened after his final evaluation. But "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

7

As a result, it makes no difference whether Geiger-Banks terminated Kinison's suicide watch prematurely, as the Estate contends. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). So, absent any evidence that Geiger-Banks knowingly disregarded an imminent suicide risk, her professional misjudgment "leads only to negligence, not deliberate indifference." *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

### a. Official-capacity claims

Even if the record allowed a finding of deliberate indifference as a matter of law, the Court would still be duty-bound to dismiss the official-capacity claims. As discussed at the summary judgment pre-filing conference, the Estate's claims against Erickson and Booker are redundant of its claim against the County. An official-capacity suit against an officer is "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The real party in interest is the municipal entity. *Id.*; *see, e.g., Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987); *Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013). So, as the owner and operator of the Whiteside County Jail, Whiteside County is the only proper defendant to this action.

### b. *Monell*

Regardless of whether the Court uses the Eighth or Fourteenth Amendment's standard, the Estate's claims must still be dismissed. Under *Monell v. Department*

8

*of Social Services*, 436 U.S. 658, 658 (1978), plaintiffs are required to directly connect the deprivation of a federal right to some municipal action. Under *Monell*, the plaintiff must show that the municipal action amounts to deliberate indifference (as defined previously) and that the municipal action was the "moving force" behind the constitutional injury. *Id.*

Municipal action can take three forms: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023) (internal quotation omitted).

But what is typically a three-road junction quickly winnows down to two options in this case. Kinison admits that the Jail employees *violated* multiple explicit policies by their actions and inactions. *See* Dkt. 62 ¶¶ 51–55. So, to defeat this Motion, Kinison had to establish either a widespread practice or custom or an action taken by a person with final policymaking authority.

      i. Widespread pattern or practice

First, the Estate contends that Whiteside County Jail has a widespread practice or custom of failing to enforce its rule against obstructing cell windows. When a plaintiff bases a *Monell* claim on a widespread practice, the plaintiff must establish that the practice is "so permanent and well-settled as to constitute a

9

custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1998) (internal quotation omitted). A *Monell* claim based on laxity in enforcing rules will survive summary judgment only if "the lax practice was 'so pervasive that acquiescence on the part of policymakers was apparent.'" *Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 394 (7th Cir. 2024) (citing *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)).

Proving that a defendant has a widespread pattern or practice of violating its own policies is even more difficult. *Doe v. DeKalb Cmty. Unit Dist. 428*, No. 23-cv-50292, 2024 U.S. Dist. LEXIS 206006, at *22 (N.D. Ill. Nov. 13, 2024); *see Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) (noting that an express policy decreases the likelihood that a pattern of similar incidents develops).

Because the Parties agree that employees inconsistently enforced the rule against obstructing the cell windows, it can't be said that the failure to enforce this rule was universal, permanent, or well-settled—much less that it "constitute[s] a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127. If anything, this inconsistency bolsters the conclusion that Whiteside County Jail lacked *any* uniform practice regarding inmates blocking their windows.

Second, the Estate argues that Whiteside County Jail systematically fails to educate inmates on Jail rules. Implied in that argument is the theory that inmates wouldn't cover their windows if they'd known it was against the rules. But that's pure speculation. There's no reason to believe that Kinison was unaware of the Jail policies. Lieutenant Tim Erickson testified that the inmate handbook was available

10

to all inmates on a kiosk. And, more importantly, when the officers instructed inmates to remove their sheets as often as once *daily*, Kinison, as an inmate in the same facility, would have discovered that rule naturally.

Even assuming failure to train inmates constitutes a widespread pattern or practice, the Estate only speculates that failure was the "moving force" behind Kinison's constitutional injuries. *Neenah Joint Sch. Dist.*, 74 F.4th at 524. It imagines that perhaps Kinison couldn't access the inmate handbook or—even more unreasonably—that he couldn't read. Neither assertion is supported by the record. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."). This Court therefore proceeds to the Estate's final attempt to establish widespread pattern or practice.

### ii. Final policymaking authority

The Court believes the Estate may be arguing that the Sheriff's failure to enforce Jail rules prevented the employees from discovering Kinison's suicide attempt. But that argument also falls short of *Monell*'s "rigorous causation standard," *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021), as the Estate never identifies a causal link between Booker's authority and Kinison's death.

As an Illinois sheriff, Booker has final policymaking authority over Jail operations. *Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 829 (7th Cir. 2022); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 344 (7th Cir. 2018). But Booker didn't

11

handle day-to-day supervision or operation of the Jail, Dkt. 62 at ¶ 36, so there's no reason to believe that his inadequate supervision caused Kinison's death. The record shows only one successful suicide attempt in the Whiteside County Jail, twenty-three years before Kinison took his life. *See id.* at ¶ 64. And, in the prior suicide, the inmate didn't attempt to block the view into his cell. *Id.*

The only suicide attempt on the record where an inmate covered the observation window was in 2019, when officers and inmates managed to save the inmate's life, despite his covering the window. *Id.* at ¶ 69. And the Court doesn't offer these horror stories just to belabor a point. These tragedies illustrate what the Parties already know by common sense: Even if employees had demanded perfect conformity with the rule against obstructing cell windows, Kinison could still have died by suicide. There's simply no reason to believe that Booker's decision-making was the moving force behind Kinison's death.

## IV. Conclusion

For the reasons explained above, the Defendants' Motion for Summary Judgment [56] is granted.

Entered: December 10, 2024         By:_____
                                   Iain D. Johnston
                                   U.S. District Judge

12